IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA22-649

Filed 20 June 2023

Franklin County, No. 20 CVS 630

IN THE MATTER OF: PATRICIA BURNETTE CHASTAIN

Appeal by Respondent from order entered 5 April 2022 by Judge Thomas H. Lock in Franklin County Superior Court. Heard in the Court of Appeals 8 February 2023.

> *Zaytoun Ballew & Taylor, PLLC, by Matthew D. Ballew, Robert E. Zaytoun, and Claire F. Kurdys, for Respondent-Appellant.*

> *Fox Rothschild LLP, by Kip D. Nelson and Elizabeth Brooks Scherer, and Davis, Sturges & Tomlinson, PLLC, by Conrad B. Sturges, III, for Affiant-Appellee.*

GRIFFIN, Judge.

Respondent Patricia Burnette Chastain appeals from an order permanently disqualifying her from serving in the Office of Clerk of Superior Court of Franklin County. This is Respondent's second appeal in this matter. Our Court addressed Respondent's first appeal in *In re Chastain*, 281 N.C. App. 520, 869 S.E.2d 738 (2022) ("*Chastain I*"), and remanded the matter for proceedings consistent with the Court's opinion.

In this appeal, we address Respondent's contention the trial court erred in its application of the appropriate standard for disqualification for office under Article VI of the North Carolina Constitution. Upon review of the trial court's application of the standard, together with Respondent's conduct, we hold the trial court properly disqualified Respondent from office as her conduct in office amounted to nothing less than corruption or malpractice.

## I. Factual and Procedural Background

In 2014, Respondent was elected to serve as Franklin County Clerk of Superior Court. She was reelected to a second term in 2018. In July 2020, Affiant Jeffrey Thompson commenced this proceeding, pursuant to N.C. Gen. Stat. § 7A-105, seeking removal of Respondent from office. Upon motion by Respondent and a subsequent hearing on the matter on 10 September 2020, the Senior Resident Superior Court Judge of Franklin County, Judge Dunlow, was recused by Judge J. Stanley Carmical. Accordingly, on 28 September 2020, Judge Thomas H. Lock, the Senior Resident Superior Court Judge of Johnston County, presided over the removal hearing, which concluded on 30 September 2020. Following the hearing, on 16 October 2020, Judge Lock issued an order ("2020 Order") permanently removing Respondent from serving in the office of Clerk of Superior Court of Franklin County. On 4 May 2020, Respondent appealed the 2020 Order to this Court. On 1 February 2022, for reasons further explained in *Chastain I*, our Court vacated the 2020 Order and remanded the matter for further proceedings consistent with that panel's opinion.

Upon remand, Judge Lock again presided over the matter which came on for hearing on 16 March 2022. On 5 April 2022, Judge Lock entered an order ("2022 Order") permanently disqualifying Respondent from serving in the Office of Clerk of Superior Court of Franklin County in accordance with Article VI of the North Carolina Constitution. On 4 May 2022, Respondent filed notice of appeal from the 2022 Order.

## II.    Standard of Review

Upon removal proceedings against a clerk of superior court, the affiant bringing the charges must prove grounds for removal exist by clear, cogent, and convincing evidence. *In re Cline*, 230 N.C. App. 11, 20–21, 749 S.E.2d 91, 98 (2013). As such, we review the trial court's findings of fact, of which Respondent challenges, to determine whether they are supported by clear, cogent, and convincing evidence, and in turn, whether those findings support its conclusions of law. *State v. Williams*, 362 N.C. 628, 632, 669 S.E.2d 290, 294 (2008) (internal marks and citations omitted). Challenged findings of fact are binding on appeal if supported by competent evidence. *Morrison v. Burlington Industries*, 304 N.C. 1, 6, 282 S.E.2d 458, 463 (1981). Likewise, findings of fact which remain unchallenged are also binding on appeal. *Koufman v. Koufman,* 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991). We review the trial court's conclusions of law de novo. *State v. Biber*, 365 N.C. 162, 171, 712 S.E.2d 874, 880 (2011).

## III.    Analysis

Respondent contends the trial court erred in permanently disqualifying and removing her from serving in the Office of Clerk of Superior Court of Franklin County, as it failed to properly apply the standard for disqualification under Article VI of the North Carolina Constitution.

At the outset, we recognize this Court is bound by our Court's previous decision in *Chastain I*. *In re Civil Penalty,* 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989) ("Where a panel of the Court of Appeals has decided the same issue, albeit in a different case, a subsequent panel of the same [C]ourt is bound by that precedent, unless it has been overturned by a higher [C]ourt."); *see also State v. Jones*, 358 N.C. 473, 487, 598 S.E.2d 125, 133 (2004) ("While we recognize that a panel of the Court of Appeals may disagree with, or even find error in, an opinion by a prior panel and may duly note its disagreement or point out that error in its opinion, the panel is bound by that prior decision until it is overturned by a higher [C]ourt."). Thus, we analyze Respondent's contentions in accordance with our Court's opinion in *Chastain I*.

## A. The Standard

Our Court's decision in *Chastain I* analyzed two constitutional avenues under which a superior court clerk of a county in North Carolina may be removed—Article IV and Article VI of our State Constitution. *See Chastain*, 281 N.C. App. at 524, 869 S.E.2d at 742. Article IV, section 17, authorizes the removal of a superior court clerk who engages in misconduct. *Id.* at 523, 869 S.E.2d at 741 (citing N.C. Const. art. IV, § 17(4)). Alternatively, Article VI, section 8, authorizes the removal of a superior

court clerk "as a consequence of being disqualified from holding any office under Article VI where she is 'adjudged guilty of corruption or malpractice in any office.'" *Id*. at 524–25, 869 S.E.2d at 742 (quoting N.C. Const. art. VI § 8) (emphasis omitted).

After addressing both avenues for removal, the Court held "the Article IV avenue could not serve as the basis for Judge Lock's decision to remove [Respondent] from office," as our Constitution conferred jurisdiction to consider Respondent's removal, under Article IV, only upon the Senior Regular Resident Superior Court Judge, Judge Dunlow. *Id.* at 524, 869 S.E.2d at 742. Additionally, our Court held Respondent could be properly removed by Judge Lock, under Article VI, if Judge Lock were to find her conduct in office met the corruption or malpractice standard supplied by Article VI, section 8, of our State Constitution because, "unlike Article IV, Article VI does not specify any procedure or confer authority on any particular judge or body to make disqualification determinations[.]" *Id.* at 525, 869 S.E.2d at 742.

Our Court had not considered the removal of a clerk of superior court before *Chastain I*. Thus, the Court relied on precedent concerning the removal of other elected officials, primarily judges, and defined this corruption or malpractice standard to include, at a minimum, "acts of willful misconduct which are egregious in nature[.]" *Id.* at 528, 869 S.E.2d at 745.

The prior panel of this Court held willful misconduct requires more than just intent to commit an offense, but rather purpose and design in doing so. *Id. (citing State v. Stephenson*, 218 N.C. 258, 264, 10 S.E.2d 819, 823 (1940)). Similarly, this

Court found willful misconduct in office to be more than an error in judgment or a mere lack of diligence. *Id.* at 528, 869 S.E.2d at 744 (citing *In re Martin,* 302 N.C. 299, 316, 275 S.E.2d 412, 421 (1981) (internal marks and citations omitted)). Instead, willful misconduct may, but is not required to, encompass conduct involving moral turpitude, dishonesty, or corruption. *Id.* The Court reiterated that where a judge knowingly and willfully persists in misconduct of which the judge knows, or should know, to be acts of willful misconduct in office "and conduct prejudicial to the administration of justice which brings the judicial office into disrepute, he should be removed from office." *Id.* (quoting *In re Martin*, 302 N.C. at 316, 275 S.E.2d at 421); *see also In re Hunt*, 308 N.C. 328, 338, 302 S.E.2d 235, 240 (1983) ("[C]onduct prejudicial to the administration of justice, if knowingly and persistently repeated, would itself rise to the level of willful misconduct in office, which is a constitutional ground for impeachment and disqualification for public office." (citing *In re Peoples*, 296 N.C. 109, 157–58, 250 S.E. 2d 890, 918 (1978))).

This Court set a framework for what constitutes willful misconduct, defining the standard to include only acts of willful misconduct which are egregious in nature. *Chastain,* 281 N.C. App. at 528, 869 S.E.2d at 745. We understand egregious acts to be those that are extremely or remarkably bad. *Egregious*, Black's Law Dictionary 652 (11th ed. 2019). In tailoring its definition, the Court relied heavily upon our Supreme Court's decision in *In re Peoples*—even so far as to say a respondent's actions would meet the standard if said acts of willful misconduct were, at a minimum, as

egregious as those in *Peoples*. *Chastain*, 281 N.C. App. at 528, 869 S.E.2d at 744*; see also In re Peoples,* 296 N.C. at 156–57, 250 S.E.2d at 917–18.[1]

The Court in *Chastain I* established this general definition of the corruption or malpractice standard. However, the application of the standard, as to the disqualification and consequential removal of clerks, has yet to be addressed. This is the task before this Court. We look to precedent addressing the application of the standard as to other elected officials, while recognizing the conduct which amounts to corruption or malpractice will necessarily differ based on the elected office held by the respondent.

## B. Application of the Standard

Respondent contends the trial court erred in applying the corruption or malpractice standard defined by our Court in *Chastain I.* Specifically, Respondent argues her conduct did not rise to meet the standard and the trial court only concluded otherwise because it considered acts alleged outside the charging affidavit and considered the evidence in totality rather than isolation. Further, Respondent explicitly challenges the trial court's Findings of Fact 17, 19, 30, 37, 45, and 46; and Conclusions of Law 3, 5, 7, 9, and 10.

---

[1] Our Supreme Court disqualified the judge from holding further judicial office under Article VI, section 8, where evidence of his misconduct included, among other things, he: dismissed several cases without trial or the defendants present and without the knowledge of the district attorney; maintained a personal file where he indefinitely held cases he caused to be removed from the active trail docket; paid the clerk money he obtained from several defendants in cases he disposed of in absence of those defendants.

### 1. *Consideration of Acts Outside the Charging Affidavit*

Respondent argues the trial court erred in applying the corruption or malpractice standard by relying on acts outside the charging affidavit to make the necessary findings and conclusions for disqualification under said standard. Specifically, Respondent argues the trial court considered incidents with Judge Davis and District Attorney Waters to support its findings that Respondent acted with notice, knowledge, and intent such that her conduct met the corruption or malpractice standard.

Our General Assembly codified the procedural mechanism for removal of clerks in N.C. Gen. Stat. § 7A-105 which states, inter alia, "the procedure [for removal of a clerk of superior court] shall be initiated by the filing of a sworn affidavit with the chief district judge of the district in which the clerk resides[.]" N.C. Gen. Stat. § 7A-105 (2021). In interpreting this statute, our Court, in *Chastain I,* recognized, pursuant to our Supreme Court's holding in *In re Spivey*, "any procedure to remove an elected official must afford that official due process." *Chastain*, 281 N.C. App. at 528–29, 869 S.E.2d at 744–45 (citing *In re Spivey*, 345 N.C. 404, 413–14, 480 S.E.2d 693, 698 (1997) (holding our Constitution does not prohibit our General Assembly from enacting methods for removal "so long as [the officers] whose removal from office is sought are accorded due process of law")).

Our Court held in *Chastain I,* that Judge Lock, in rehearing any case pertaining to Respondent's removal, was limited to considering only those acts

alleged in the charging affidavit, as Respondent had both the due process and statutory right to notice of the acts for which her removal was being sought. *Chastain*, 281 N.C. App. at 529, 869 S.E.2d at 745. Our Court noted, however, the trial court was permitted to consider facts not alleged in the charging affidavit as a means to assess Respondent's credibility. *Id.* at 529, 869 S.E.2d at 745*; see State v. Johnson*, 378 N.C. 236, 242, 861 S.E.2d 474, 482 (2021) ("'The weight, credibility, and convincing force of such evidence is for the trial court, who is in the best position to observe the witnesses and make such determinations.'" (quoting *Macher v. Macher*, 188 N.C. App. 537, 540, 656 S.E.2d 282, 284 (2008))).

Though the trial court is limited in what it can consider during proceedings for removal of a clerk, we are cognizant that, "[w]here, as here, the trial judge acted as the finder of fact, it is presumed that he disregarded any inadmissible evidence that was admitted and based his judgment solely on the admissible evidence that was before him." *In re Cline*, 230 N.C. App. 11, 27, 749 S.E.2d 91, 102 (2013) (citing *Bizzell v. Bizzell*, 247 N.C. 590, 604–06, 101 S.E.2d 668, 678–79 (1958)) (internal quotation marks and citations omitted). Consequently, this Court will only find reversible error where it affirmatively appears the action of the court was influenced by the consideration of inadmissible evidence. *See Bizzell*, 247 N.C. at 604–05, 101 S.E.2d at 678.

Here, evidence not contained in the charging affidavit, which had been previously introduced in the first removal proceeding against Respondent, was

excised from the record.  Notably, counsel for Respondent stated:

> Certain things came into evidence.  [Affiant's counsel] put certain things into the evidence that was not in the affidavit.  None of that—that's been excised.  That's out of this record now.  Particularly the matters relating to fixing the tickets, allegedly, that the DA testified to, as well as going to the district court judge repeatedly to strike orders of arrest.  That's—that's not—that's not here before you.

Not only were these allegations excised from the record upon which the trial court relied in making its findings and conclusions here, but the trial court further confirmed its declination in considering this evidence by unequivocally stating within its findings and conclusions, it had not relied upon this evidence except to consider Respondent's credibility as authorized by this Court in *Chastain I.*  In Finding of Fact 14, the trial court stated:

> Respondent's interactions with Mr. Waters and Judge Davis described in the preceding two paragraphs were not specifically alleged in the changing affidavit.  Hence, the court has not considered the evidence concerning them as a potential basis for removal.  However, this evidence has been considered to assess Respondent's credibility[.]

Similarly, in Finding of Fact 48, the trial court stated:

> As to evidence related to Respondent's conduct discussed at the evidentiary hearing but not alleged in the charging affidavit, the court has not considered such evidence as grounds for Respondent's disqualification from office.

Thereafter, the trial court concluded in Conclusion of Law 4:

> Respondent's repeated requests to District Attorney Michael Waters on behalf of persons seeking the reduction or dismissal of criminal charges and her repeated ex parte

> requests to Judge John Davis to strike orders of arrest for persons charged with criminal offenses were not specifically alleged in the charging affidavit and were not considered by this court as a potential basis for removal. However, this evidence was considered to assess Respondent's credibility[.]

These Findings and Conclusion demonstrate the trial court's abstention from relying on evidence outside the charging affidavit for purposes other than considering Respondent's credibility. Moreover, Judge Lock acted as the fact finder. Thus, we presume he only used this evidence to assess credibility pursuant to our decision in *Chastain I*.

We hold the trial court did not err as it properly excluded acts outside the charging affidavit from consideration when making the necessary findings and conclusions for the disqualification of Respondent under the corruption or malpractice standard.

### 2. *Conduct Considered in Totality rather than Isolation*

Respondent argues the trial court erred in applying the standard by considering Respondent's conduct in totality rather than in isolation. Accordingly, Respondent challenges Conclusions of Law 9 and 10.

Removal proceedings against Respondent were initiated pursuant to N.C. Gen. Stat. § 7A-105 which states, in part, "[a] clerk of superior court may be suspended or removed from office for willful misconduct[.]" N.C. Gen. Stat. § 7A-105. Our Court in *Chastain I* stated: "we construe the language 'willful misconduct' in Section 7A-

105 in the context of an Article VI hearing to include only those acts of willful misconduct which rise to the level of 'corruption or malpractice' in office." *Chastain*, 281 N.C. App. at 528, 869 S.E.2d at 744. The Court further noted, "Judge Lock lacked authority to rely on any acts of [Respondent] that did not rise to this level to support his sanction under Article VI." *Id.*

This Court did not limit the scope of Judge Lock's review to only those acts which independently rose to meet the corruption or malpractice standard under Article VI. Instead, the Court simply instructed that, upon remand, Judge Lock could not base his sanction—Respondent's disqualification—upon any act which did not rise to the corruption or malpractice standard. Further, the Court's holding instructed the trial court to limit its review to "whether the acts alleged in the charging affidavit before [Judge Lock] rose to the level of 'corruption or malpractice' in office under Article VI of our Constitution." *Chastain*, 281 N.C. App. at 530, 869 S.E.2d at 745–46. Neither instruction by this Court forbids or limits the trial court from considering Respondent's actions in totality in order to conclude those actions met the standard for disqualification under Article VI.

Further, in defining the corruption or malpractice standard, this Court relied on precedent which allowed for such aggregation. Specifically, this Court in *Chastain I* quoted *In re Martin* stating, "[w]e do note that our Supreme Court has stated that 'persistent' acts of 'misconduct' may rise to the level of '[willful] misconduct.'" *Chastain*, 281 N.C. App. at 528, 869 S.E.2d at 744 (quoting *Martin*, 302 N.C. at 316,

- 12 -

275 S.E.2d at 421). This shows our Court did not intend the "any acts" language to limit the scope of the trial court's review to only those acts by Respondent which independently rose to meet the standard. Accordingly, we hold the trial court did not err in applying the standard where it considered Respondent's actions in totality rather than in isolation.

Nonetheless, we address Respondent's contention as to the trial court's Conclusions of Law 9 and 10, which state:

> 9. Even if Respondent's acts of misconduct viewed in isolation do not constitute willful misconduct, her knowing and persistently repeated conduct prejudicial to the administration of justice itself rises to the level of willful misconduct, is equivalent to corruption or malpractice under Article VI of the Constitution of North Carolina, and warrants permanent disqualification from office.

> 10. . . . Even if each act of misconduct was insufficient to warrant disqualification from office independently, the cumulative effect of the willful misconduct is that it was egregious in nature, was equivalent to corruption or malpractice under Article VI, § 8 of the Constitution of North Carolina, and warrants permanent disqualification from office.

Respondent argues these Conclusions of Law improperly lump all of Respondent's isolated conduct together to find it collectively rose to meet the standard. Our Court in *Chastain I* never limited the trial court's review to only acts which independently rose to the standard. Thus, the trial court did not err in Conclusions of Law 9 or 10.

### 3. Findings of Fact 17, 19, 30, 37, 45, and 46; and Conclusions of Law 3, 5, and 7

Respondent specifically challenges the trial court's Findings of Fact 17, 19, 30, 37, 45, and 46; and Conclusions of Law 3, 5, and 7.

### a. *Finding of Fact 17*

Respondent argues Finding of Fact 17 "erroneously states that [Respondent] 'went to the Franklin County Detention Center and demanded that she be allowed access to Machada for the purpose of having him complete an affidavit of indigency.'" However, the relevant portion of Finding of Fact 17 states:

> Respondent went to the Franklin County Detention Center and sought access to Machada for the purpose of having him complete an affidavit of indigency.

Respondent contends this Finding is erroneous as there is no testimony or evidence in the record suggesting she "demanded" anyone in the jail allow her access to Machada. However, not only is Finding of Fact 17 void of the word "demand," of which Respondent takes issue, but Respondent's testimony at the hearing indicates that on 7 March 2017, she went to the Franklin County Detention Center to see Machada and spoke with him for ten minutes. Finding of Fact 17 is supported by competent evidence and is therefore binding on appeal.

### b. *Finding of Fact 19*

Respondent argues the trial court erred in Finding of Fact 19 which states:

> When Sheriff Winstead learned of this incident, he banned Respondent from further visits in the detention center.

Respondent contends "this incident" refers to the erroneous facts described in Finding

of Fact 17 and the record is void of evidence that Sheriff Winstead ever learned of Respondent's "demand," or that Sheriff Winstead ever offered any testimony as to the specific reason he decided not to let Respondent return to the jail. Finding of Fact 19 is not erroneous as to its reference of "this incident," for, as mentioned above, the word "demand" does not appear in Finding of Fact 17. Further, the trial court did not err where it relied on Finding of Fact 17 in making Finding of Fact 19, as Finding of Fact 17 is supported by competent evidence.

Moreover, Sheriff Winstead testified at the September 2020 hearing as to Respondent being banned from the jail:

> Q: All right. Have you been present for any of [Respondent's] trips to the jail?
>
> A: No, I have not.
>
> Q: Okay. Are you aware of incidents that have occurred while she has been at the jail?
>
>  . . .
>
> A: Yes.
>
>  . . .
>
> Q: All right. As a result of incidents, have you taken any action?
>
> A: I have.
>
> Q: And what is that action?
>
> A: I do not allow [Respondent] to come in our facilities or the sheriff's office, jail, or magistrate's office.

. . .

Q: As a result of any of the Machada incidents, have you had to take any action with regard to the clerk?

A: As a result to the Machada incidents. I mean that was one of the incidents that was brought as far as not letting her back into the jail.

This testimony provides evidentiary support for Finding of Fact 19. Because Finding of Fact 19 is supported by competent evidence, it is binding on appeal.

c. *Conclusion of Law 3*

Respondent argues the trial court erred in Conclusion of Law 3, which states:

When Respondent, without the knowledge or authorization of the presiding district court judge, demanded access to the county jail for the purpose of obtaining an affidavit of indigency from a murder defendant knowing that the defendant already had been appointed counsel and afforded a first appearance before the district court judge, her conduct was an inappropriate intervention into the case and was an act beyond the legitimate exercise of Respondent's authority notwithstanding the Rules of the North Carolina Commission on Indigent Defense Services. Her actions were an effort to undermine Judge Davis' authority. Such willful misconduct was egregious in nature and is equivalent to corruption or malpractice under Article VI of the Constitution of North Carolina.

Respondent contends this Conclusion of Law is clearly erroneous as it relies upon a fact with no support from the record by stating Respondent decided to see Machada in jail "knowing that [Machada] already had been appointed counsel." Respondent further asserts there is not a separate finding within the trial court's order to support this fact.

The above portion of Conclusion of Law 3 challenged by Respondent serves as an ultimate finding. An "ultimate finding is a conclusion of law or at least a determination of a mixed question of law and fact and should be distinguished from the findings of primary, evidentiary, or circumstantial facts." *In re Z.A.M.*, 374 N.C. 88, 97, 839 S.E.2d 792, 798 (2020) (quotations and citations omitted). However, regardless of whether the trial court's statement is considered a finding of ultimate fact or a conclusion of law, there must be adequate evidentiary findings of fact to support the ultimate finding or conclusion of law. *Id.* (quotations and citations omitted). Nevertheless, "[w]here there are sufficient findings of fact based on competent evidence to support the trial court's conclusions of law, the judgment will not be disturbed because of other erroneous findings which do not affect the conclusions." *Black Horse Run Property Owners Association-Raleigh, Inc. v. Kaleel*, 88 N.C. App. 83, 86, 362 S.E.2d 619, 621 (1987) (citations omitted); *see also In re Estate of Skinner*, 370 N.C. 126, 139–40, 804 S.E.2d 449, 458 (2017).

We agree with Respondent that the portion of Conclusion of Law 3, which indicates Respondent went to the detention facility knowing Machada had been appointed counsel, is not supported by record evidence. In fact, although Respondent testified she understood Judge Davis had conducted Machada's first appearance, she stated she was not aware a lawyer had already been appointed. As such, this portion of Conclusion of Law 3, which we deem an ultimate finding, is not supported by adequate evidentiary findings of fact and is therefore erroneous.

Regardless, there are sufficient findings of fact to support Conclusion of Law 3. The trial court's additional findings in this Conclusion are supported by Respondent's own testimony, stating, upon arriving at her office the morning of the incident, "[t]he staff stated that Judge Davis had come early that morning and gotten one of the staff to go with him to the magistrate's office and to do the preliminary hearing." Despite Respondent testifying she was unable to find an affidavit of indigency within Machada's file, she was informed of Judge Davis's involvement in the Machada case and did not inquire as to the affidavit of indigency before going to the detention center to meet with Machada.

This evidence, in combination with the trial court's unchallenged findings of fact, are sufficient to support Conclusion of Law 3. Therefore, regardless of whether a portion of this conclusion is erroneous, the ultimate conclusion is not.

The trial court did not err in Conclusion of Law 3.

*d. Finding of Fact 30*

Respondent contends the trial court erred in a portion of Finding of Fact 30, which states:

> Respondent told the Diazes that she was telling them the
> law in this matter, and that Judge Davis "legally" did not
> have the right to enter the orders he had entered.

Respondent argues Finding of Fact 30 erroneously states Respondent told the Diazes "that Judge Davis did not have the right to enter the orders he had entered" as both the body camera footage and transcript of the same show otherwise. However, the

body camera footage captured during Respondent's conversation with Adam Diaz proves the opposite. Respondent references the order entered by Judge Davis and its contents, stating: "[Judge Davis] legally can't say that." This statement, within the footage, provides sufficient evidence to support the above Finding. Because Finding of Fact 30 is supported by competent evidence, it is binding on appeal.

*e. Finding of Fact 37*

Respondent contends Finding of Fact 37 erroneously states:

> Respondent's statements to the Diazes again evidenced a sympathy for Ms. Gayden and a calculated decision to act on Ms. Gayden's behalf in her legal dispute with the Diazes. Respondent knew or should have known that her conduct in the dispute was well beyond the legitimate exercise of her authority and severely undermined the administration of justice. It moreover evidenced contempt for the legitimacy of Judge Davis' lawful orders.

Respondent argues this Finding is not supported by competent evidence because Respondent had a genuine interest in hearing the concerns of both parties. Further, Respondent argues she engaged in a voluntary discussion with the Diazes, listened intently as they explained their concerns, and wished the Diazes happiness and peace from the long-running ordeal. Respondent contends there exists no evidence that her conduct was a calculated decision to intervene in the dispute solely to support Gayden's position.

To the contrary, the body camera footage, obtained during Respondent's conversations with both Gayden and the Diazes, provides sufficient evidence to

support this Finding. On 27 December 2019, Respondent met with Gayden outside her home, and sympathized with Gayden as to the conflict with the Diazes stating, "anything more I am going to look at as pure harassment, pure harassment, and it's not right. It's not right, and we're not going to put up with it." Further, Respondent repeatedly told Gayden that Adam Diaz was abusing the legal system by continually calling 911 and even expressed pity toward Gayden's position in the conflict noting, "it sounds like, to me, that at this point, you're getting picked on." Respondent then left Gayden and went to the Diaz home to address the issue. The footage depicts Respondent arriving at the Diaz home, and stating she was there to mediate. The video further shows Respondent positioning herself as an advocate for Gayden as she argued with Adam Diaz about every issue over which he expressed concern. Additionally, Respondent consistently referred to Adam Diaz's behavior, in calling 911, as an abuse of the judicial process. At one point, the officer on scene had to pull Respondent aside to correct her, stating he believed the Diazes were doing the right thing by calling 911 and had not been abusing the system. While, by the end of her encounter with the Diazes, Respondent was somewhat friendly, she entered the conversation with animosity toward the Diazes.

This body camera footage is, in itself, sufficient evidence to support Finding of Fact 37.

### f. *Conclusion of Law 5*

Respondent contends the trial court improperly relied upon Finding of Fact 30

in making Conclusion of Law 5, which states:

> By intervening into the legal dispute between Ann Elizabeth Gayden and Adam and Sarah Diaz, and by engaging in that conduct on 27 December 2019 described in paragraphs 25 through 37 of the above Findings of Fact and that subsequent conduct on 31 December 2019 described in paragraph 38 of those Findings, Respondent engaged in conduct which tended to undermine the authority of John Davis, breed disrespect for his office and the legal processes already in place, and diminish the high standards of the office of Clerk of Superior Court.

Of the findings of fact mentioned here—Findings of Fact 25-38—Respondent only challenges Findings of Fact 30 and 37, which, as stated above, are supported by competent evidence. These Findings, with the other twelve unchallenged findings, support Conclusion of Law 5. Therefore, the trial court did not err in Conclusion of Law 5.

### g. *Finding of Fact 45*

Respondent challenges a portion of the trial court's Finding of Fact 45, which states:

> . . . Mr. Arnold heard Respondent say, "I just talked with the chief magistrate and he's not going to do a thing." He then heard Respondent say, "F[---] John Davis" or "F[---], I'm not calling John Davis" or "I don't give a f[---] about John Davis."

Respondent argues this Finding is erroneous as it is not supported by competent evidence because Magistrate Arnold admitted he did not know exactly what phrase Respondent used but that it could have been any of the three. Magistrate Arnold

testified at the hearing: "The second thing [Respondent] said was, . . . either, f[---] John Davis; f[---], I'm not calling John Davis, or I don't give a f[---] about John Davis." Finding of Fact 45 includes this exact language without asserting that Magistrate Arnold knew exactly what Respondent said. Finding of Fact 45 is supported by competent evidence and is therefore binding on appeal.

*h. Finding of Fact 46*

Respondent argues the trial court erred in Finding of Fact 46 as it "erroneously concludes from the evidence [Respondent] did, in fact, say, 'F[---] John Davis.'" Respondent's argument lacks merit as the quoted language appears nowhere in Finding of Fact 46, which states:

> Under N.C. Gen. Stat. § 7A-146, the chief district court judge of each judicial district is charged with the supervision of the magistrates in the judge's district. The clerk of Superior Court has no supervisory authority over magistrates.

Because Respondent's argument here does not correspond with the challenged Finding, Respondent's argument lacks merit and is overruled. Thus, Finding of Fact 46 is binding on appeal.

*i. Conclusion of Law 7*

Respondent challenges a portion of Conclusion of Law 7 which states:

> By publicly attempting to exercise authority over Chief Magistrate James Arnold on 25 June 2020—conduct outside the scope of her official responsibilities—and thereafter using vulgarity in the presence of members of the public to describe her feelings toward Chief District

Court Judge Davis, Respondent, at a minimum, engaged in
conduct prejudicial to the administration of justice which
brings her office into disrepute[.]

Respondent argues this Conclusion erroneously states Respondent engaged in improper conduct by using vulgarity to describe her feelings toward Judge Davis. However, Finding of Fact 45, which was supported by competent evidence, indicates Respondent used vulgarity to describe her feelings toward Judge Davis. Because the trial court's findings of fact support this Conclusion, the trial court did not err.

### 4. *Respondent's Conduct and Resulting Disqualification*

We now review Respondent's conduct to determine whether the trial court properly disqualified Respondent from office, having concluded she acted in a manner which rose to the corruption or malpractice standard.

Respondent addresses four instances of misconduct—The Affidavit of Indigency, The Gayden/Diaz Home Visit, The Magistrate Arnold Phone Call, and The Audit—arguing her actions do not rise to the corruption or malpractice standard.

### a. *Respondent's Conduct*

The trial court's Findings of Fact reflect the following:

<u>The Affidavit of Indigency</u>

On or about 6 March 2017, the defendant, Machada, was arrested for first-degree murder. On 7 March 2017, Sheriff Winstead informed the District Attorney, Mr. Waters, he did not want to transport Machada to the courtroom for a first appearance as he considered Machada dangerous and a security risk. District

- 23 -

Attorney Waters then asked Judge Davis to conduct Machada's first appearance in the county jail and Judge Davis agreed. Machada was uncommunicative during his first appearance. Thus, Judge Davis did not ask Machada to complete an affidavit of indigency regarding the appointment of counsel.

Later that day, Respondent looked at Machada's file and did not find a completed affidavit of indigency. A member of Respondent's staff told her Judge Davis had conducted Machada's first appearance earlier that morning. Notwithstanding this information and without speaking to Judge Davis, Respondent went to the Franklin County Detention Center, met with Machada, and had him complete an affidavit of indigency.

After discovering Respondent's actions in visiting with Machada, Sheriff Winstead banned Respondent from further visits in the detention center, as well as the Sheriff's Office and Magistrate's Office. Sherriff Winstead stated the Machada incident was only one of the incidents involving the Respondent he considered in making the decision.

The Gayden/Diaz Home Visit

On 27 December 2019, Respondent went to the neighboring properties of Ann Gayden and Adam and Sarah Diaz to mediate an ongoing dispute between the two. Respondent was aware of the dispute and knew Judge Davis had entered no-contact orders against Gayden and in favor of the Diazes. These orders were still in effect. Respondent called the Sheriff's Office and asked a deputy to meet her at the

properties. Deputy Dailey met Respondent on scene and witnessed interactions between Respondent and both Gayden and the Diazes. He captured the interactions on his body camera. Respondent went to Gayden and told her she believed Gayden was being picked on and harassed. Respondent also told Gayden that Adam Diaz was abusing the system by calling 911 and would be criminally charged if he continued to do so.

Next, Respondent went to the Diaz home and confronted Adam Diaz, stating, "I have a right and an obligation lawfully to come out here and mediate this." Respondent also stated she had jurisdiction over the entire county and was obligated by law to mediate the case. Respondent continued to refer to Adam Diaz's behavior, in calling 911, as an abuse of the judicial process until Deputy Dailey pulled her aside and told her it was not. Additionally, in speaking about the restraining order, Respondent told Adam Diaz, "as far as I'm concerned its for both of you" and even stated, in reference to the order, "[Judge Davis] legally can't say that." When Adam Diaz told Respondent she was speaking contrary to what Judge Davis had told them, she responded: "I'm telling you the law." When the Diazes complained Gayden had a drinking problem, Respondent told them to request Gayden have an assessment. The Diazes said they had asked for one previously but the judge said "they didn't have the power to do that[.]" Respondent then stated, "yes you do. Based on the evidence that I've heard, this would help her[,]" even noting she had the authority to, and would, order Gayden's assessment herself.

On 31 December 2019, Respondent directed one of her employees to file a copy of Gayden's deed containing the easement across the Diazes' property in two of the lawsuits Gayden had filed against the Diazes. In both case files, Respondent handwrote "Ms. Ann Gayden has legal right of way to travel per easement to her property" in the margin of the deed. Respondent did not consult with and was not authorized by Judge Davis or any other district court judge before she did so, nor did she inform any district court judge or the Diazes' attorney she had placed this document in the case files thereafter.

The Magistrate Arnold Phone Call

On 25 June 2020, Franklin County Chief Magistrate James Arnold received a phone call from Respondent. She was yelling and often incoherent during the conversation. Respondent said she was at Magistrate Arnold's office and had several people with her who wanted to talk with a magistrate. She then demanded Magistrate Arnold send a magistrate to talk with the people. Magistrate Arnold stated he would not send a magistrate without knowing more information and asked Respondent to let him speak with the people, but she refused. Respondent threatened to give out Magistrate Arnold's personal phone number or post her own number on the door of the Magistrate's Office. Magistrate Arnold requested she not do either and said he would talk with her the next day. He suggested she contact Judge Davis if she wanted to complain about the Magistrate's Office. Respondent stated she was not going to call Judge Davis and Magistrate Arnold ended the phone call. Nearly 30

to 45 seconds later, Magistrate Arnold's cell phone rang. He knew Respondent was calling and could tell, after answering, she had inadvertently called. Magistrate Arnold heard Respondent say, "I just talked with the chief magistrate and he's not going to do a thing." He then heard Respondent say, "F[---] John Davis" or "F[---], I'm not calling John Davis" or "I don't give a f[---] about John Davis."

The Audit

Pursuant to the North Caroline State Auditor's duty to periodically examine and report on the financial practices of state agencies and institutions, the State Auditor's office conducted a performance audit of the Franklin County Clerk of Court's office for the period from 1 July 2019 through 31 January 2020. The Auditor thereafter published a written report of the Auditor's findings. Although the Auditor found no evidence of embezzlement or misappropriation of funds, several deficiencies in internal control and instances of noncompliance that were considered reportable were identified, including: untimely completion of bank reconciliations; failure to identify and transfer unclaimed funds to the State Treasurer or rightful owner; failure to compel estate inventory filings or fee collection; failure to compel inventory filings or assess and collect sufficient bonds for estates of minors and incapacitated adults; and failure to accurately disburse trust funds held for minors and incapacitated adults.

Further, in Respondent's response to the audit, she admitted: new employees were not properly trained in preparing bank reconciliations or on the escheat process;

her office failed to document evidence of its requests to compel estate inventory filings; her staff made unintentional mistakes in calculating inventory fees and not collecting the required amounts; and monitoring procedures were not in place to ensure the reconciling adjustments were entered into the financial management system, to ensure funds were transferred and apparent owners notified, to ensure inventories were compelled timely and bonds were sufficient for the guardianship estates, or to ensure trust funds were accurately disbursed.

### b. *Resulting Disqualification*

Our Court in *Chastain I* defined the corruption or malpractice standard to include acts of willful misconduct which are egregious in nature. *See Supra*. III.A. Upon remand, the trial court relied on this definition to disqualify Respondent. Thus, we do the same, noting as our Supreme Court did in *In re Peoples*, that in order to properly appraise Respondent's conduct we need only ask one question: "What would be the quality of justice and the reputation of the courts, if every clerk, exercised the duties of her office in the manner Respondent did here?" *See Peoples*, 296 N.C. at 156, 250 S.E.2d at 917.

Respondent was the Clerk of Superior Court of Franklin County for six years. This time in office is significant. Respondent knew, or should have known, the duties and ethical responsibilities of her office. *See* N.C. Gen. Stat. § 7A-103 ("Authority of clerk of superior court."). Conversely, Respondent continually acted outside the scope of her position as Clerk and engaged in misconduct. This misconduct not only

undermined the authority of Judge Davis and other judges in the county but brought the judicial system into disrepute.

Respondent knew Judge Davis had already conducted Machada's first appearance. Nonetheless, she went to the detention center, without advisement from Judge Davis, and held a meeting with Machada. In doing so, Respondent acted in a manner prejudicial to the administration of justice and undermined the authority of Judge Davis. Additionally, Respondent was willfully persisting in misconduct such that Sherriff Winstead testified he had prior issues with Respondent—to the extent that, upon learning of this incident, he was forced to ban Respondent from entering the Sheriff's Office, jail, and Magistrate's Office.

In another instance, Respondent, despite knowing the Clerk of Superior Court has no supervisory authority over magistrates, called Magistrate Arnold and demanded he send a magistrate to speak with people waiting outside the Magistrate's Office. Further, Respondent unequivocally acted with conduct prejudicial to the administration of justice which inevitably brought the judicial office into disrepute by speaking with absolute vulgarity about Judge Davis stating: "F[---] John Davis" or "F[---], I'm not calling John Davis" or "I don't give a f[---] about John Davis." This was done in the presence of citizens of Franklin County.

Even without considering the above instances, Respondent's conduct in the Gayden/Diaz dispute, alone, was sufficient to warrant her disqualification. There is no procedure which calls for the mediation of actions like the one in which Gayden

and the Diazes were involved. Respondent also engaged a represented party as the Diazes had an attorney in this matter. The Clerk of Superior Court certainly understands their role is not to try and practice law, much less with a represented party. Regardless, Respondent went to the properties of each and professed it was her legal duty to mediate their dispute. Despite being aware of the order issued by Judge Davis concerning the matter, Respondent continued to try and mediate the situation. These acts with Respondent's additional statements severely undermined the administration of justice and the authority of Judge Davis as Respondent made claims about the order stating, "[Judge Davis] legally can't say that." Moreover, Respondent did not have the authority to modify official court files in connection with the Gayden-Diaz dispute. Yet, she instructed a member of her staff to file several deeds on which she made handwritten notes without authorization and without notifying anyone thereafter.

Here, Respondent knowingly persisted in misconduct as she consistently acted beyond the scope of her authority as Clerk. Further, she acted in a manner prejudicial to the administration of justice in continuing to undermine the authority of both Judge Davis and other judges within the district by questioning their judgment, condemning court orders, and in altering and filing deeds without authorization. The Clerk of Superior Court knows that these actions are beyond the duties of that office. Respondent's conduct rose to meet the corruption or malpractice standard as Respondent's actions constituted willful misconduct which was egregious

in nature.

Having reviewed the above instances of Respondent's conduct, we hold Respondent was properly disqualified as her conduct amounted to corruption or malpractice.

**C. *Chastain I***

Notwithstanding our holding here, we emphasize our discrepancies with the Court's opinion in *Chastain I*.

Undoubtedly, in congruence with our Court's opinion in *Chastain I*, we recognize Article IV, section 17, authorizes the removal of a superior court clerk who engages in misconduct. N.C. Const. art. IV, § 17. Further, we agree that, pursuant to Article IV, section 17(4), none other than Judge Dunlow could preside over Respondent's removal proceeding. *Chastain*, 281 N.C. App. at 522, 869 S.E.2d at 741 ("Article IV confers on a single individual, the authority to remove the elected Clerk in a county; namely, the senior regular resident Superior Court Judge in that same county. Accordingly, no other judge may be conferred with jurisdiction over the subject matter of removing a Clerk for misconduct under Article IV.").

However, our Court in *Chastain I* held, as an alternative, Article VI, section 8, authorizes the removal of a superior court clerk "as a consequence of being disqualified from holding any office under Article VI where she is 'adjudged guilty of corruption or malpractice in any office.'" *Chastain*, 281 N.C. App. at 524–25, 869

S.E.2d at 742 (quoting N.C. Const. art. VI § 8) (emphasis omitted). With this, we disagree.

Article VI, section 8 of our Constitution states:

> The following persons shall be disqualified for office:
>
> . . . any person who has been adjudged guilty of corruption or malpractice in any office, or any person who has been removed by impeachment from any office, and who has not been restored to the rights of citizenship in the manner prescribed by law.

N.C. Const. art. VI, § 8. This article concerns disqualification for office, not removal from office. Based on the plain language contained in the constitutional provisions—Article IV, section 17(4), specifically references removal while Article VI, section 8, concerns only disqualification—coupled with the fact that Article IV, section 17, is specifically titled "Removal of Judges, Magistrates, and Clerks" while Article VI, section 8, is titled "Disqualifications for office" we can be certain that Article VI is a disqualification provision only and not one of removal. For, if it was intended Article VI serve, alongside Article IV, as an additional means for removal from office, Article VI would have been drafted in the same manner as Article IV.

Further, our Court in *Chastain I* erroneously effectuates N.C. Gen. Stat. § 7A-105 as a procedural mechanism for disqualification under Article VI of our State Constitution when it was only intended as a procedural mechanism for removal of clerks under Article IV.

Chapter 7A, section 105, of the North Carolina General Statutes, titled "§ 7A-105. Suspension, removal, and reinstatement of clerk[,]" states:

> A clerk of superior court may be suspended or removed from office for willful misconduct or mental or physical incapacity, and reinstated, under the same procedures as are applicable to a superior court district attorney, except that the procedure shall be initiated by the filing of a sworn affidavit with the chief district judge of the district in which the clerk resides, and the hearing shall be conducted by the senior regular resident superior court judge serving the county of the clerk's residence.  If suspension is ordered, the judge shall appoint some qualified person to act as clerk during the period of the suspension.

N.C. Gen. Stat. § 7A-105.  This statute is a procedural mechanism for removal of clerks under Article IV of our State Constitution alone, as, by its plain language, the statute offers no guidance as to how someone may be disqualified for office.

However, our Court, in *Chastain I*, relied on *Peoples* to hold otherwise.  In *Peoples*, our Supreme Court noted the long, complicated history of Article VI, section 8, specifically citing a major revision in our State Constitution in 1971.  *Peoples,* 396 N.C. at 165, 250 S.E.2d at 922.  Our Supreme Court further explained the revision "extended the bar against office holding persons found guilty of committing a felony against the United States or another state and substituted the phrase 'adjudged guilty' for the term 'convicted.'"  *Id.* at 166, 250 S.E.2d at 923.  Moreover, the Court concluded:

> [T]he substitution of the term "adjudged guilty" for the term "convicted" permits the General Assembly to prescribe proceedings in addition to criminal trials in

which an adjudication of guilt will result in disqualification from office.

*Id.* Relying on this conclusion, the Court in *Peoples* analyzed N.C. Gen. Stat. § 7A-376, a statute which bars a judge from future judicial office when he has been removed for willful misconduct stating, in relevant part:

> (b) Upon recommendation of the Commission, the Supreme Court may . . . remove any judge for willful misconduct in office, . . . or conduct prejudicial to the administration of justice that brings the judicial office into disrepute. . . . *A judge who is removed for any of the foregoing reasons . . . is disqualified from holding further judicial office.*

N.C. Gen. Stat. § 7A-376 (2021) (emphasis added). The Court held this statute was enacted pursuant to the General Assembly's power to "prescribe proceedings in addition to criminal trials in which an adjudication of guilt will result in disqualification from office" under Article VI. *Peoples*, 296 N.C. at 166, 250 S.E.2d at 923. Further, the Court held, through this statute, the General Assembly was acting within its power when it made disqualification from judicial office a consequence of removal. *Id.*

Like the Court in *Peoples*, we too recognize the General Assembly's right to prescribe procedure for disqualification, but unlike the Court in *Peoples*, we must apply N.C. Gen. Stat. § 7A-105, a statute which can be distinguished from section 7A-376 as it applies only to clerks, not judges, and lacks any reference to disqualification at all. Further, we must presume our General Assembly intentionally refrained from, or has yet to consider, including disqualification as a consequence of removal under

section 7A-105 as the General Assembly included specific language referencing disqualification as a consequence of removal under section 7A-376. *See Rodriguez v. United States*, 480 U.S. 522, 525 (1987) (citations omitted) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."); *see also State v. McCants*, 275 N.C. App. 801, 822, 854 S.E.2d 415, 430 (2020).

Aside from noting the General Assembly can provide a procedural mechanism for disqualification of clerks but has yet to do so, we must point out that our Court in *Chastain I* sought to hold removal proper as a consequence of disqualification. *See Chastain*, 281 N.C. App. at 524, 869 S.E.2d at 741. Our Supreme Court in *Peoples* only held the General Assembly acted within their authorization to create a statute, concerning judges, under which disqualification was a consequence of removal and not vice versa. As *Peoples* and *Chastain I* differ in this way, we find no authority under which removal has been considered as a consequence of disqualification.

While we recognize a person currently in office, who is disqualified for any future office pursuant to Article VI, section 8, after being adjudged guilty of corruption or malpractice in office, should likely be removed from the office they currently hold, neither our Constitution nor our General Statutes provide for removal upon disqualification.

We do not take issue with the Court's interpretation of the corruption or malpractice standard under Article VI. We only note the Court's application of the standard as to removal, together with its application and recognition of N.C. Gen. Stat. § 7A-105 as a procedural mechanism for disqualification, was in error as the standard applies only to disqualification and the statute only serves as a procedural mechanism for removal. As such, our Court, in *Chastain I*, should have remanded the matter for further proceedings by Judge Dunlow under Article IV without instructing on an alternative method for removal.

## IV.    Conclusion

In congruence with our Court's opinion in *Chastain I*, we hold the trial court did not commit error in ordering Respondent permanently disqualified from serving in the Office of Clerk of Superior Court of Franklin County, pursuant to Article VI of the North Carolina Constitution, as Respondent's conduct amounted to nothing less than corruption or malpractice.

AFFIRMED.

Judge FLOOD concurs.

Judge Wood dissents by separate opinion.

WOOD, Judge, dissenting.

The outcome of this matter is of significant importance to North Carolina jurisprudence and future interpretation of the North Carolina Constitution. Review of an order removing an elected judicial official is one of the "most serious undertaking[s]" in which an appellate court may engage. *In re Hayes*, 356 N.C. 389, 406, 584, S.E.2d 260, 270 (2002). Our Supreme Court has instructed that Article VI "expressly limit[s] disqualifications to office for those who are *elected by the people* to those disqualifications set out in the Constitution." *Baker v. Martin*, 330 N.C. 331, 339, 410 S.E.2d 887, 892 (1991) (emphasis added). Article VI, Section 8 requires that "any person who has been adjudged guilty of corruption or malpractice in any office" shall be disqualified from holding office. Because this is an ultimate consequence, conduct must rise to the high constitutional standard of *egregious* and willful misconduct so as to constitute "corruption or malpractice" before an elected official may be permanently disqualified from office. Because I believe the trial court's findings of fact do not support its conclusion that Ms. Chastain's actions were so *egregious* as to warrant permanent disqualification from office, I respectfully dissent from the majority opinion.

## I. Background

Ms. Chastain began service as the Franklin County Clerk of Superior Court on 1 May 2013, having been appointed by the Honorable Judge Robert J. Hobgood, who was the senior Resident Superior Court Judge of Franklin County. The people of

Franklin County, thereafter, elected Ms. Chastain to be their Clerk of Superior Court in 2014 and re-elected her to that position in 2018. It is clear from the record that, over the course of her service as Clerk of Superior Court, animosity grew between Ms. Chastain and certain officers of the court and other civil servants in Franklin County.

This animosity climaxed in 2020 after a local attorney commenced an action seeking the removal of Ms. Chastain from office, pursuant to N.C. Gen. Stat. § 7A-105, by filing an affidavit alleging that she had committed acts of willful misconduct. The charging affidavit alleged several acts of misconduct that the affiant had not personally witnessed. Superior Court Judge Thomas H. Lock presided over the matter during a hearing which took place from 28 September 2020 to 30 September 2020. On 16 October 2020, the trial court ordered that Ms. Chastain be removed from office and permanently disqualified from holding office as Clerk of Superior Court. Ms. Chastain appealed. For reasons further explained in *Chastain I*, this Court vacated the order and remanded the matter to the trial court on 1 February 2022. This Court reasoned, if Senior Resident Superior Court Judge John Dunlow were to hear the matter on remand, the court could utilize the lesser standard specified in Article IV to remove Ms. Chastain from office. If, however, Judge Lock were to rehear the matter, the court could only utilize the higher standard specified in Article VI.

On remand, Judge Lock again presided over the matter and ordered that Ms. Chastain be permanently disqualified and removed from office, this time in professed accordance with Article VI of the North Carolina Constitution. Ms. Chastain once

more appeals to this Court pursuant to Article IV, Section 17(4) of our Constitution, alleging, among other things, that the trial court committed error when it concluded that the alleged misconduct merited her disqualification and removal from office.

## II.     Standard of Review

In Clerk of Superior Court removal proceedings before the trial court, the Affiant bringing charges bears the burden of proof, by "clear, cogent and convincing evidence," that grounds exist for removal. *In re Cline*, 230 N.C. App. 11, 21, 749 S.E.2d 91, 98 (2013). Accordingly, we must determine whether the trial court's "findings of fact are adequately supported by clear and convincing evidence, and in turn, whether those findings support its conclusions of law." *In re Hill*, 368 N.C. 410, 416, 778 S.E.2d 64, 68 (2015).

When reviewing the conduct of an elected Clerk of Superior Court, it must be noted that our Supreme Court held:

> Absent evidence to the contrary, it will always be presumed "that public officials will discharge their duties in good faith and exercise their powers in accord with the spirit and purpose of the law. . . . Every reasonable intendment will be made in support of the presumption."

*Styers v. Phillips*, 277 N.C. 460, 473, 178 S.E.2d 583, 591 (1971) (quoting *Huntley v. Potter*, 255 N.C. 619, 628, 122 S.E.2d 681, 687 (1961)).

We review the trial court's conclusions of law *de novo* on appeal. *In re K.J.D.*, 203 N.C. App. 653, 657, 692 S.E.2d 437, 441 (2010). "Under a *de novo* standard of review, this Court considers the matter anew and freely substitutes its own judgment

3

for that of the trial court." *Reese v. Mecklenburg Cnty.*, 200 N.C. App. 491, 497, 685 S.E.2d 34, 38 (2009) (citations omitted).

## III. Discussion

Our elected judicial officials, including our Clerks of Superior Court, are entrusted by the people with the administration of justice on their behalf. N.C. Const. art. I, § 2. Thus, where our elected officials are "drawn from the same fountain of authority, the people," and where our Constitution allows for the removal of an elected official by a like official, such removal must be effectuated with the utmost care and respect for the people's will—and not purely as a result of internal, oligarchical enmity. The Federalist No. 51 (James Madison).

The Clerk of Superior Court is a constitutional officer, whose office is established by Article IV, Section 9(3) of our Constitution. Our Constitution provides the avenues by which an elected Clerk may be removed. As *Chastain I* reasoned, Article VI is the only constitutional provision applicable to the disqualification and, consequentially, removal of an elected clerk when a judge other than the senior resident superior court judge adjudicates the matter. *Chastain I*, 281 N.C. App. 520, 529, 869 S.E.2d 738, 745 (2022). Though the senior resident superior court judge could have presided over the matter under the Rule of Necessity as explained in *Chastian I*, Judge Lock presided, and therefore, Article VI is the controlling constitutional provision.

Under Article VI, Section 8, "any person who has been adjudged guilty of

4

corruption or malpractice in any office" shall be disqualified from holding public office. N.C. Const. art. VI, § 8. If a person elected to public office becomes disqualified from office, it necessarily follows that the person may no longer serve in that office and must be removed. *See Chastain I*, 281 N.C. App. at 527, 869 S.E.2d at 744 (discussing removal under Article VI). For purposes of disqualification after being "adjudged guilty of corruption or malpractice," removal from office is effectuated upon adjudication. By the plain language of this provision, it is clear the drafters intended only for the most egregious conduct to apply, including disqualification by impeachment, being found guilty of treason, being found guilty of a felony, or being adjudged guilty of corruption or malpractice in office. This Court construed this "corruption or malpractice" standard "to include at a minimum acts of willful misconduct *which are egregious in nature.*" *Id.* at 528, 869 S.E.2d at 744 (emphasis added) (citing *In re Peoples*, 296 N.C. 109, 166, 250 S.E.2d 890, 923 (1978)). Implicit in this expression and as supported by our caselaw, the "corruption or malpractice" standard of Article VI requires more than mere "misconduct" or even "willful misconduct"; it requires *egregious* and willful misconduct.

The North Carolina Supreme Court has defined corruption as "[t]he act of an official or fiduciary person who unlawfully and wrongfully uses his station or character to procure some benefit for himself or for another person, contrary to duty and the rights of others." *State v. Agnew*, 294 N.C. 382, 392–93, 241 S.E.2d 684, 691 (1978) (quoting *State v. Shipman*, 202 N.C. 518, 540, 163 S.E. 657, 669 (1932)). It

requires proof of an unlawful or fraudulent intent. *Id.* Multiple other crimes resulting from misconduct in public office are set forth in our General Statutes. *See* N.C. Gen. Stat. §§ 14-228 to -248 (2022). Offenses of public office which require a corrupt or fraudulent intent or involve leveraging public office to unlawfully obtain a material benefit are charged as felonies; whereas charges of failure to properly discharge duties or misuse of confidential information are misdemeanors. *Id.*

Being "adjudged guilty of malpractice" is not defined under our statutes. I agree with the proposition advanced by Respondent that, arguably, the nearest analogy is a civil claim for professional malpractice damages. To establish a civil claim for professional malpractice, the plaintiff must show: the nature of the defendant's profession; the defendant's duty to conform to a certain standard of conduct; a breach of duty; and proximate cause of harm to the claimant. *Reich v. Price*, 110 N.C. App. 255, 258, 429 S.E.2d 372, 374 (1993), *cert. denied*, 334 N.C. 435, 433 S.E.2d 178 (1993). In contrast, for the criminal offense of willful failure to discharge duties in office under N.C. Gen. Stat. § 14-230, which is subject to only a misdemeanor sentence and subsequent removal from office, it must be evidenced that the defendant is an official of a state institution; the official willfully failed to discharge the duties of his office; and the act or omission resulted in injury to the public. *State v. Birdsong*, 325 N.C. 418, 422, 384 S.E.2d 5, 7 (1989). It can be inferred then that "malpractice in office" under Article VI requires at a minimum not only the specific intent to willfully violate one's official duties under the law but also proof that

6

such conduct was *egregious* and proximately caused injury to the claimant or the public.

*In re Peoples* provides helpful context under this high standard. 296 N.C. 109, 250 S.E.2d 890 (1978). There, our Supreme Court disqualified a former district court judge from holding any elected office pursuant to Article VI after the Judicial Standards Commission instituted an action against him and recommended he be removed from office. For several years, the judge had, among other things, repeatedly removed certain cases from the active trial docket and into the judge's indefinitely pending "personal file" and had accepted money from defendants for "court costs" that were never received by the clerk's office. *Id.* at 155–56, 250 S.E.2d at 917. Prior to a hearing on the action brought by the Judicial Standards Commission, the judge in that case resigned, and the removal power of Article IV no longer had effect. However, our Supreme Court permanently disqualified him from public office under Article VI due to the egregious nature of the judge's conduct. Discussing what "guilty" means in Article VI, our Supreme Court held that "[t]he word *guilty* connotes evil, intentional wrongdoing and refers to conscious and culpable acts." *Id.* at 165, 250 S.E.2d at 922. *In re Peoples* is one of the only cases that directly contemplates Article VI, and its holding reinforces the notion that disqualification under Article VI is an extreme consequence.

For lack of caselaw regarding Article VI disqualifications, Ms. Chastain provides this Court with an exhaustive list of cases involving the removal of elected

officials under Article IV. Article IV allows for the removal of a clerk of superior court "for misconduct or mental or physical incapacity." N.C. Const. art. IV, § 17. Article IV's "misconduct" standard presents a lesser standard than Article VI's "corruption or malpractice" standard, *Chastain I*, 281 N.C. App. at 525, 869 S.E.2d at 742, yet all of our Article IV cases evidence acts substantially more egregious in nature than Ms. Chastain's alleged misconduct, even when viewed in the light most damning to Ms. Chastain.

In one example, our Supreme Court upheld the removal of a district attorney who, while in the early morning hours at a bar, repeatedly yelled "ni--er" to another patron and engaged in "other improper conduct" before being forcefully removed. *In re Spivey*, 345 N.C. 404, 408, 480 S.E.2d 693, 695 (1997). In another case, a district court judge was removed for accepting multiple cash bribes. *In re Hunt*, 308 N.C. 328, 330, 302 S.E.2d 235, 236 (1983). Still more, a superior court judge was properly removed after eliminating conditions of a probationer without notice to the district attorney, sexual misconduct, and coercing an assistant district attorney to "help" the judge's former mistress in a DWI case. *In re Kivett*, 309 N.C. 635, 309 S.E.2d 442 (1983); *see also In re Sherill*, 328 N.C. 719, 403 S.E.2d 255 (1991) (judge possessed marijuana, cocaine, and drug paraphernalia); *In re Cline*, 230 N.C. App. 11, 749 S.E.2d 91 (2013) (district attorney repeatedly and publicly accusing a judge of "intentional and malicious conduct" such that his "hands are covered with the blood of justice" and other invectives made with actual malice).

In the present matter, Ms. Chastain's conduct, even if willful and considered in isolation or combination, was not *egregious* as to merit her disqualification and removal from the elected office of Clerk of Superior Court. The trial court relied upon four instances of misconduct in its findings of fact before concluding that Ms. Chastain's conduct "warrant[ed] permanent disqualification from office."

**A. Affidavit of Indigency**

In the first instance, the trial court found that Ms. Chastain "demanded access to the county jail for the purpose of obtaining an affidavit of indigency from a murder defendant knowing that the defendant already had been appointed counsel." The findings as to this event are as follows:

> 15. On or about 6 March 2017, the Franklin County Sheriff's Office arrested an individual named Oliver Funes Machada for the first degree murder of his mother by decapitating her. Sheriff Kent Winstead telephoned District Attorney Waters and asked him to come to the crime scene. Later that day, either a district court judge or Indigent Defense Services appointed provisional counsel for Machada.

> 16. The next morning, 7 March 2017, the Sheriff informed Mr. Waters that he did not want to transport Machada to the courtroom for a first appearance because he considered Machada dangerous and a security risk. Mr. Waters then asked Chief District Court Judge John Davis if he would conduct Machada's first appearance in the county jail, and Judge Davis agreed. Machada was uncommunicative during his first appearance. Judge Davis did not ask Machada to complete an affidavit of indigency regarding the appointment of counsel.

> 17. Later that day, Respondent looked at Machada's

court file and observed that there was not a completed affidavit of indigency in it. A member of Respondent's staff told her that Judge Davis already had conducted Machada's first appearance earlier that morning. Notwithstanding this information and without speaking to Judge Davis, Respondent went to the Franklin County Detention Center and sought access to Machada for the purpose of having him complete an affidavit of indigency. In so doing, Respondent interfered with a matter that Judge Davis already had addressed.

18. Rules 1.4 and 2A.2 promulgated by North Carolina Commission on Indigent Defense Services require a defendant to complete and sign a sworn affidavit of indigency in every case in which counsel is appointed. Rule 1.1(4) further provides: "When these rules describe the functions a court performs, the term 'court' includes clerks of superior courts." Nonetheless, Respondent's intervention in these proceedings, after Machada already had been afforded a first appearance, was improper.

19. When Sheriff Winstead learned of this incident, he banned Respondent from further visits in the detention center.

From this, the trial court concluded as a matter of law that, by having the defendant fill out this indigency form after he had been appointed counsel, Ms. Chastain's actions were "an inappropriate intervention into the case and was an act beyond the legitimate exercise of Respondent's authority notwithstanding the Rules of the North Carolina Commission on Indigent Defense Services" and "were an effort to undermine Judge Davis'[s] authority" and that "[s]uch willful misconduct was egregious in nature and is equivalent to corruption or malpractice under Article VI." I disagree.

The trial court recognized that Ms. Chastain had the authority and

responsibility under "Rules 1.4 and 2A.2 promulgated by North Carolina Commission on Indigent Defense Services" to "require a defendant to complete and sign a sworn affidavit of indigency in every case in which counsel is appointed." The trial court further found that "Rule 1.1(4) further provides: 'When these rules describe the functions a court performs, the term "court" includes clerks of superior courts.' " Yet despite recognizing this responsibility, the trial court found Ms. Chastain's conduct to be improper. Truly, respect for a judge's authority, especially by one employed in the administration of justice, is necessary for the proper reverence of our institution. Perhaps it was true that Ms. Chastain, on this occasion, succumbed in some small way to that familiar tinge of frustration and took matters upon herself to complete that which the judge neglected to do. The record does more than hint at the animosity surrounding the officials here. However, this single occurrence of alleged misconduct, if it could be called misconduct at all, was not so egregious as to support the disqualification and removal of a democratically elected clerk from office under Article VI.

I also note that Ms. Chastain testified that she was unaware that an attorney had actually been appointed to Machada prior to his signing an affidavit of indigency, and no evidence was introduced to challenge this understanding. Nevertheless, even taken as true, the findings do not support the conclusion that Ms. Chastain's actions breached the high standard of egregious and willful misconduct necessary to warrant disqualification from office.

## B. Dispute Between Neighbors

In the second instance, the trial court found that Ms. Chastain improperly intervened in an easement dispute between two neighbors, against one of whom Judge Davis had previously entered a no-contact order. The dispute had been ongoing between the parties for several years. The trial court found the following:

> 25. On the morning of 27 December 2019, a Franklin County resident named Ann Elizabeth Gayden came to the Office of the Clerk of Superior Court and complained to Respondent about an ongoing dispute with her neighbors, Adam and Sarah Diaz, concerning an easement. Respondent was familiar with Ms. Gayden and was aware of the dispute. Respondent specifically was aware that Chief District Court Judge John Davis, pursuant to Chapter 50-C of the General Statutes of North Carolina, had entered no-contact orders *against* Ms. Gayden and *in favor* of the Diazes on 20 February 2019, and Respondent knew those orders were still in effect.

> 26. Respondent decided to go [to] the properties of Ms. Gayden and the Diazes. She called the Franklin County Sheriff's Office and asked that a deputy meet her there. Although Respondent testified that she believed Ms. Gayden was experiencing some sort of crises, she also testified that she went to the Diazes' residence for a social visit. Respondent's testimony in this regard was inconsistent. The court further finds it to be disingenuous and an attempt to minimize the seriousness of her interference in the Gayden-Diaz dispute.

> 27. Sheriff's Deputy Justin Dailey was dispatched to the scene, and he arrived at approximately 11:18 a.m. on 27 December 2019. He thereafter witnessed the interactions between Respondent and Ms. Gayden and Respondent and the Diazes. Deputy Dailey moreover recorded these interactions on the body camera he was wearing. Deputy Dailey's recording was received in

evidence as Affiant's Exhibit 1.

28. Respondent met first with Ms. Gayden, who was visibly upset. Respondent told Ms. Gayden, among other things, that Ms. Gayden legally owned the easement and had a right to enter the driveway, that she (Respondent) was going to enter an order that day, that she thought Ms. Gayden was afraid and scared, and that Ms. Gayden was "getting picked on." Respondent further stated that if he (Adam Diaz) continued "to do this", Respondent was going to call 911 and he would be charged. Respondent moreover told Ms. Gayden that Respondent, by law, could mediate any case and said that was what she was doing.

29. Respondent knew that she did not have the authority to enter orders or to interfere with Judge Davis's prior orders in this matter. Respondent falsely led Ms. Gayden to believe otherwise, thereby undermining the normal judicial process, including Judge Davis' judicial authority. Respondent's statements to Ms. Gayden furthermore evidenced a sympathy for her and a deliberate decision to intervene on her behalf in Ms. Gayden's legal dispute with the Diazes.

30. Thereafter, Respondent went to the residence of the Diazes and met them outside their home. The Diazes also were visibly upset. Respondent introduced herself, told the Diazes that she had jurisdiction over the entire county, and falsely stated that she was obligated to mediate their case. Mr. Diaz told Respondent that there was already a restraining order against Ms. Gayden in place, and Respondent replied that, as far as Respondent was concerned, the restraining order was for both of them. Mr. Diaz stated that Ms. Gayden continued to operate a tractor on the easement and to loiter on it in violation of the court order, to which Respondent replied that she thought Ms. Gayden was videotaping the Diaz property to prove that she (Gayden) was not doing anything. Respondent told the Diazes that she was telling them the law in this matter, and that Judge Davis "legally" did not have the right to enter the orders he had entered.

31. Respondent's false and misleading statements to the Diazes were made with the intent to undermine Judge Davis' prior order and judicial authority, and were made to benefit Ms. Gayden.

32. Respondent's false and misleading statements also were made to intimidate the Diazes into believing that she would influence or change the Diazes legal rights relating to the easement dispute, particularly if the Diazes did not permit Ms. Gayden to use the easement as Respondent deemed fit. In so doing, Respondent misstated the scope of her authority in an effort to affect the proceedings.

33. Respondent was aware the Diazes were represented by counsel, namely, Jeffrey Scott Thompson (the Affiant), in their cases against Ms. Gayden, but Respondent told the Diazes they should hire another attorney in connection with the dispute. Respondent knew or should have known that it was improper for the Clerk of Court to recommend a particular attorney or to disparage an attorney to that attorney's clients.

34. Respondent finally told the Diazes to give it (the dispute) one more court date and that the orders could be extended if needed. Respondent shook hands with the Diazes, gave them her business card and personal cell phone number, and departed the scene.

35. The no-contact orders that Judge Davis had entered on 20 February 2019 did not restrain any conduct or activity by the Diazes. Respondent knew or should have known this fact.

36. There are no procedures in place in the Ninth Judicial District for the mediation of Chapter 50-C actions. Respondent was aware that she had no legal authority to conduct mediation or to compel the parties to a lawsuit to mediate it. Her statements to the parties that she was obligated by law to mediate the matter were false.

37. Respondent's statements to the Diazes again

evidenced a sympathy for Ms. Gayden and a calculated decision to act on Ms. Gayden's behalf in her legal dispute with the Diazes. Respondent knew or should have known that her conduct in the dispute was well beyond the legitimate exercise of her authority and severely undermined the administration of justice. It moreover evidenced contempt for the legitimacy of Judge Davis' lawful orders.

38. On 31 December 2019, Respondent, at the request of Ms. Gayden, directed one of her employees to file a copy of Ms. Gayden's deed containing the easement across the Diazes' property in two of the lawsuits Ms. Gayden had filed against the Diazes. In both case files (Franklin County File Numbers 19 CVD 444 and 19 CVD 445), Respondent handwrote the following words in the margin of the deed: "Ms. Ann Gayden has legal right of way to travel per easement to her property." Respondent wrote these words without the authorization of Chief District Court Judge John Davis, and without consulting any other district court judge about her action. Respondent did not thereafter inform any district court judge or the Diazes' attorney that she had placed this document in these case files. Respondent knew she did not have the authority to modify official court files in connection with the Gayden-Diaz dispute.

39. The incident of 27 December 2019 involving Respondent's interactions with Ms. Gayden and the Diazes was widely reported in the Franklin County news media and on Raleigh television station WRAL. Clips from Affiant's Exhibit 1 were included in the WRAL news broadcasts.

The trial court concluded that, because Ms. Chastain intervened in that matter and made false and misleading statements, Ms. Chastain "engaged in conduct which tended to undermine the authority of Judge Davis, breed disrespect for his office and the legal processes already in place, and diminish the high standards of the office of

15

Clerk of Superior Court." He found this occurred after Judge Davis and the District Attorney rebuked Ms. Chastain for "acting outside the scope of her official responsibilities." Thus, the trial court concluded that "[s]uch willful misconduct was egregious in nature . . . and independently warrants permanent disqualification from office."

I join with the trial court's reprimand of Ms. Chastain in this instance; it is not the place of a Clerk of Superior Court to interject herself into the legal dispute of two neighbors and make false statements, even for the purposes of ameliorating the situation. However, this, too, is not an instance of *egregious* misconduct warranting her disqualification from office and, thus, does not support the trial court's conclusion of law. Ms. Chastain's initiative, though misplaced, produced no injury to any individual, was exercised with parties who did not have an action pending before her, was not an "evil, intentional wrongdoing," and stands as comparatively innocent with the cases cited above wherein elected officials were removed under a lesser standard than required here. Having worked with the disputes between these warring neighbors for many years, Ms. Chastain was more than familiar with the parties involved. Ms. Chastain did not personally gain any benefit from mediating a truce here, which might otherwise imply some level of corruption. Though she may have harbored sympathies for one party over the other, this does not weigh into a consideration of corruption or malpractice.

To be clear, I am reiterating the high standard necessary to disqualify a citizen,

16

particularly an elected official, from office. Though she may have acted beyond the scope of her position, as the majority holds, this overstep cannot be held to have been egregious or to proximately cause injury to the public so as to invoke her disqualification under Article VI, Section 8.

## C. Magistrate Call

In the third instance, the trial court found that Ms. Chastain "attempt[ed] to exercise authority over Chief Magistrate James Arnold . . . and thereafter us[ed] vulgarity in the presence of members of the public to describe her feelings toward Chief District Court Judge Davis." The trial court's findings are as follows:

> 41. Respondent said she was at Mr. Arnold's office located in the Sheriff's Office. The magistrate's office was unattended at the time because the office was short-staffed. There was a sign posted on the door of the magistrates' office instructing members of the public to call 911 if they needed a magistrate after normal business hours.

> 42. Respondent told Mr. Arnold that she had some people with her, and he could hear people talking in the background. Respondent stated that she had received several complaints about the hours the magistrates' office was open. Mr. Arnold told Respondent that a magistrate was on call 24 hours a day, to which Respondent replied that she was open 24 hours a day.

> 43. Respondent told Mr. Arnold that the people with her wanted to talk with a magistrate and demanded that he send a magistrate to the office to talk with them. The Respondent did not say what the people with her wanted and she did not claim that they were experiencing any sort of emergency. Mr. Arnold stated that he would not send a magistrate without knowing more and he asked

17

Respondent to let him speak with the people. Respondent refused.

44. Respondent threatened to give Mr. Arnold's private telephone number to the people with her, and he stated that she should not do that. Respondent then told him that she was going to post her own telephone number on the magistrates' door, to which Mr. Arnold replied that Respondent was not a magistrate. Mr. Arnold told Respondent he would talk with her the next day and suggested that she call Chief District Court Judge John Davis if she wanted to complain about the magistrates' office. Respondent stated she was not going to call Judge Davis, and Mr. Arnold ended the telephone call.

45. About 30 to 45 seconds later, Mr. Arnold's cell phone rang again. He could tell from his phone's caller ID feature that Respondent was the person calling. He answered his telephone and could hear Respondent talking to other people whom he also could hear in the background. Respondent did not say anything to Mr. Arnold, and he quickly concluded that she had inadvertently called him without realizing she had done so. Mr. Arnold heard Respondent say, "I just talked with the chief magistrate and he's not going to do a thing." He then heard Respondent say, "F[---] John Davis" or "F[---], I'm not calling John Davis" or "I don't give a f[---] about John Davis." Regardless of Respondent's exact words, she made highly inappropriate and vulgar statements in the presence of others with the intent to undermine the public's respect for Judge Davis and Mr. Arnold and for their judicial authority.

46. Under N.C. Gen. Stat. § 7A-146, the chief district court judge of each judicial district is charged with the supervision of the magistrates in the judge's district. The clerk of Superior Court has no supervisory authority over magistrates.

As with the previous instances, the trial court concluded Ms. Chastain attempted to

exercise authority over the magistrate and that conduct was "outside the scope of her official responsibilities—and thereafter us[ed] vulgarity in the presence of members of the public to describe her feelings toward Chief District Court Judge Davis." The court concluded that she "at a minimum, engaged in conduct prejudicial to the administration of justice which brings her office into disrepute." The court further concluded that, while acting in her official capacity, her conduct was "intentional and knowing, and she acted with a specific intent to accomplish a purpose which she knew or should have known was beyond the legitimate exercise of her authority" and that this instance "independently warrants permanent disqualification from office."

Although the trial court could not determine the exact words Respondent used, it found that "she made highly inappropriate and vulgar statements in the presence of others with the intent to undermine the public's respect for Judge Davis and Mr. Arnold and for their judicial authority." However, words, and the meaning behind them, are important and necessary in determining someone's intent. From the trial court's findings of the four potential statements that may have been made by Respondent, there are four different interpretations and intentions that could be found. Furthermore, Magistrate Arnold testified, while he believed he heard Respondent say the curse word at issue, he did not know what phrase she actually said. Instead, he testified that that the most he could say is that he heard her say a single phrase which, for all he knew, could very well have been, "F__, I am not calling John Davis." Accordingly, such evidence cannot support the trial court's conclusion

19

that Respondent used "vulgarity in the presence of members of the public to describe her feelings toward Chief District Court Judge Davis."

The trial court's finding that the Clerk of Superior Court does not have supervisory authority over magistrates is correct; however, under North Carolina law, the Clerk of Superior Court has the statutory obligation to nominate all magistrates for selection by the senior resident superior court judge of the district. N.C. Gen. Stat. § 7A-171 (2022). As such, it does not strain credibility that Respondent may have felt authorized or obligated to call the chief magistrate when she found the magistrate's office unmanned. Implicit with the official duty of nominating magistrates is the obligation of the Clerk to keep herself informed about the job performance of the magistrates in her district so she can make an intelligent decision as to whether to renominate any such individuals in the future.

The trial court's findings do not support the conclusion that Ms. Chastain's actions rise to the level of egregious and willful misconduct demanded of Article VI's "corruption or malpractice" standard to warrant disqualification from office.

## D. Periodic Audit

In the fourth instance, the trial court found that Ms. Chastain's "deficiencies in the oversight of the financial and accounting responsibilities of the Clerk of Superior Court . . . evidenced a gross unconcern for her fiduciary duties . . . and demonstrated a reckless disregard for the high standards of her office." This instance stemmed from a periodic audit of the clerk's office. The trial court found the following:

20

20. Pursuant to the North Carolina State Auditor's duty to periodically examine and report on the financial practices of state agencies and institutions, State Auditor Beth A. Wood's office conducted a performance audit of the Franklin County Clerk of Court's office for the period from 1 July 2019 through 31 January 2020. The Auditor thereafter published a written report of the Auditor's findings. (Affiant's Exhibit 10)

21. The Auditor identified the following deficiencies in internal control and instances of noncompliance that were considered reportable under the Government Auditing Standards issued by the Comptroller General of the United States:

- Untimely completion of bank reconciliations;

- Failure to identify and transfer unclaimed funds to the State Treasurer or rightful owner and failure to notify apparent owners;

- Failure to compel estate inventory filings or fee collection;

- Untimely or failure to compel inventory filings or assess and collect sufficient bonds for estates of minors and incapacitated adults; and

- Failure to accurately disburse trust funds held for minors and incapacitated adults.

22. The Auditor found no evidence of embezzlement or misappropriation of funds by the Respondent or any employee of the Clerk of Court's office.

23. In respondent's written response to the audit, included in the Auditor's Report, Respondent admitted, among other things, that: new employees were not properly trained in preparing bank reconciliations; monitoring procedures were not in place to ensure the reconciling adjustments were entered into the financial management

system; new employees were not properly trained on the escheat process; monitoring procedures were not in place to ensure funds were transferred and apparent owners were notified; her office failed to document evidence of its requests to compel estate inventory filings; her staff made unintentional mistakes in calculating inventory fees and not collecting the required amounts; monitoring procedures were not in place to ensure inventories were compelled timely and bonds were sufficient for the guardianship estates; and new employees were not properly trained and monitoring procedures were not in place to ensure trust funds were accurately disbursed.

24. By the time of the audit, Respondent had been in office more than 6 years and knew or reasonably should have known the accounting and fiduciary responsibilities of the Office of Clerk of Superior Court. Nonetheless, she willfully and persistently failed to perform some of the core duties of her responsibilities as Clerk of Court.

The trial court concluded that these deficiencies "evidenced a gross unconcern for her fiduciary duties . . . and demonstrated a reckless disregard for the high standards of her office." The court concluded that "Respondent's lack of oversight of her office constituted willful misconduct in office that was egregious in nature, is equivalent to corruption or malpractice . . . and independently warrants permanent disqualification from office" under Article VI of our Constitution.

Yet, as with the other instances, the deficiencies revealed by the Auditor's report could hardly be said to constitute the *egregious* and willful misconduct necessary to disqualify and, consequently, remove an elected official from office pursuant to Article VI. The audit did not reveal any criminal or material misconduct by Respondent or anyone in her office. It did identify areas where improvements

22

could be made regarding the training and monitoring of staff members. It is not appropriate to equate temporary deficiencies in the training and monitoring of employees with intentional and knowing misuse of office. The audit found no evidence of "knowing misuse" of office or bad faith intent to violate the law. Willful misconduct requires "more than an error of judgment or a mere lack of diligence," and acts of "negligence or ignorance," in the absence of bad faith intent to violate the law, do not rise to the level of willful misconduct. *In re Nowell*, 293 N.C. 235, 248–49, 237 S.E.2d 246, 255 (1977).

## E. Cumulative Consideration of Actions

The trial court, in the alternative to finding independent grounds to support the requirements of Article VI, concluded that the instances listed above, when considered together, constituted *egregious* and willful misconduct sufficient to disqualify Ms. Chastain from office. I disagree. While our Supreme Court in *In re Martin* asserts that "if a judge knowingly and wil[l]fully persists in indiscretions and misconduct which . . . constitute wil[l]ful misconduct in office and conduct prejudicial to the administration of justice which brings the judicial office into disrepute, he should be removed from office," 295 N.C. 291, 305–06, 245 S.E.2d 766, 775 (1978), the holding is inapplicable here. Ms. Chastain did not "persist in indiscretions and misconduct." As noted above, the instances the trial court noted were singular, isolated occurrences, separated by substantial time, place, and parties involved. Further, in *Chastain I*, this Court held that "Judge Lock lacked authority to rely on

23

any acts of Ms. Chastain that did not rise to [corruption or malpractice] to support his sanction under Article VI." 281 N.C. App. at 528, 869 S.E.2d at 744. The trial court cannot commingle and combine conduct that is not egregious and willful to reach the highest bar of corruption and malpractice under Article VI.

Because the caselaw relied upon by the parties and the trial court involve the removal or disqualification of elected judges or district attorneys, I take this opportunity to clarify a matter concerning the standard of conduct of a Clerk of Superior Court. Though the procedure for removing a Clerk of Superior Court may be the same as that necessary for the removal of district attorneys and judges, the standards are not the same. For example, district attorneys are held to the Rules of Professional Conduct governing lawyers. Thus, a trial court may consider removing a district attorney for violation of these standards which might be relevant if the lawyer were to "engage in conduct that is prejudicial to the administration of justice," "state or imply an ability to influence improperly a government agency or official," and "knowingly assist a judge or judicial officer in conduct that is a violation of applicable rules of judicial conduct or other law." N.C. Rules of Pro. Conduct r. 8.4. Similarly, judges are held to the standards outlined in the Code of Judicial Conduct. A judge may be removed if that judge engages in conduct prejudicial to the administration of justice such as failing to "perform the duties of the judge's office impartially and diligently" or exhibiting "impropriety." N.C. Code of Judicial Conduct r. 2-3.

24

Clerks of Superior Court, by contrast, are not required to be licensed attorneys as a condition of holding office and, consequently, are not held to the same high standards as lawyers and judges. As the trial court noted in one of its findings, "there is no formal code of ethics applicable to Clerks of Court." Instead, this Court looks to the standard of "corruption or malpractice" as stated in our Constitution when determining if a Clerk of Superior Court was properly disqualified from office under Article VI. In an apparent nod to the Rules of Professional Conduct applicable to lawyers and judges under *In re Peoples*, the trial court concluded that Ms. Chastain's conduct was "prejudicial to the administration of justice." However, this is not the standard for disqualification of a Clerk of Superior Court under Article VI, Section 8.

I stress this is no mere firing of an employee. By being adjudged guilty of corruption or malpractice, Ms. Chastain is not only removed from elected office, but is forever prohibited from holding *any* elected office. As our Supreme Court long ago said of disqualification,

> It fixes upon the convicted party a stigma of disgrace and reproach in the eyes of honest and honorable men that continues for life. It is difficult to conceive of a punishment more galling and degrading in this country than disqualification to hold office, whether one be an office seeker or not.

*Harris v. Terry*, 98 N.C. 131, 133, 3 S.E. 745, 746 (1887). Perhaps the greater injury rests upon the people of Franklin County who elected Ms. Chastain as their Clerk of Superior Court multiple times. Our system is not wholly democratic (and this,

25

perhaps, for good reason), but, when adjudicating the disqualification of an elected official, care for the people's will is requisite to the proper respect for their sovereignty. The trial court here did not respect that sovereignty.

## IV.  Conclusion

The will of the people must not be cast aside by the stroke of a judge's pen without due consideration and just cause under the high standard set forth by our Constitution. Therefore, I respectfully dissent.